COZINE *vs.* HORN.

*In the matter of the Guardianship of* SARAH JANE HORN.

IN selecting a Guardian for an infant, the wishes of the nearest relatives, or the declared wishes of the deceased parents will be considered ; but there is no arbitrary rule controlling the selection, the matter being within the discretion of the Surrogate, to be exercised with a view to the social relations and the welfare of the minor.

The relatives have no interest as parties, but they are summoned to give the necessary information to enable the Court to judge who is the most proper person to be the guardian.

CHARLES EDWARDS, *for Mrs. Cozine.*
W. C. FREEMAN, *for Mrs. Horn.*

THE SURROGATE. The maternal grandmother of Sarah Jane Horn, a minor, presented an application for the appointment of her son-in-law, Samuel Fleet, as guardian of the infant ; and after ascertaining who were the nearest relatives of the infant residing in the county, I assigned a day for the hearing, and directed the proper notice to be given. On the return of the notice, Amelia Horn, the stepmother of the infant, appeared, and also presented a petition, praying for her own appointment as guardian.

The child was born, Dec. 12, 1836, at the Cozine homestead ; her mother died in childbed, and the daughter was reared in the grandmother's family, and remained there until about nine years of age, being specially under the charge of her aunt, Mrs. Dorland, who was then unmarried.

Mr. Horn having married a second time, at Charleston, and removed to this city about 18 months after his marriage, then resumed the custody of the child, and she continued to reside with him till his death in December, 1849, since which time, she has remained with her stepmother.

By his second marriage, Mr. Horn had two children, who are still living. Mrs. Cozine, the grandmother, Mr. and Mrs. Fleet, and Mrs. Dorland, the nearest relatives on the mother's side, all favor the appointment of Mr. Fleet as guardian. Mrs. Horn, the infant's paternal grandmother, and Mrs. Smith, her father's sister, concur in Mrs. Amelia Horn's application.

The child has no property descending from her father, but is interested in her deceased mother's share of certain real estate in New-York, consisting of the Cozine homestead, and property adjacent. The father, before his decease, in writing as well as verbally, expressed in very explicit terms his wish, that the child should after his death remain with her stepmother, and be brought up in the family with her half-brothers. ·

In all litigated cases of this kind, the duty of the Surrogate in selecting a guardian, where the nearest relatives disagree, is delicate, embarrassing and difficult. The Legislature has prescribed no order or rule of preference to be followed in making this selection, but has left a large discretion to the Court, which is to be exercised, however, in subservience to sound and reasonable principles, having in view all the social relations, and above all, the welfare of the infant. Each particular case is of course to be judged of by its own peculiar circumstances, and it would be unwise to lay down any arbitrary rule, which should regard certain facts as controlling. Thus, while it has been decided that the fact, that the property of the infant came by the father's or mother's side, affords no sufficient ground for preferring the paternal or maternal relatives; and also that the declared wishes of the deceased parents are entitled to much weight in deciding upon the claims of the different relatives to the guardianship (*Underhill* vs. *Dennis*, 9 *Paige*, 203), yet, I do not understand that any such circumstances are to be held as conclusive, irrespective of other important considerations affecting the happiness and future well-being of the infant. If the father had put his

wishes in legal form, and had appointed a testamentary guardian, there would have been an end to the discussion. Having failed to do so, the matter is still left open, though great deference will be given to his opinion and desire, however informally expressed.

On the one hand, it is not to be overlooked, that the stepmother, through the medium of her children, the half-brothers of the infant, still stands in the same degree[1] of affinity to this child as before the death of her husband. (*Paddock* vs. *Wells*, 2 *Barbour's Ch. R.*, 332.) In view of the declaration of the deceased father, and the affinity still existing between the child and her stepmother, I should certainly be inclined to leave her where she may be educated with her half-brothers, and probably receive the benefits flowing from their companionship and affection, when they shall attain maturer years. But other facts have been presented to me which cannot be disregarded, if the true interests of the minor are to be consulted, rather than the wishes of those who seek for the guardianship. (*Bennett* vs. *Byrne*, 2 *Bar. Ch. R.*, 216.) In a matter of this kind, the relatives have no interest as parties, but they are summoned to give the necessary information, to enable the Court to judge who is the most proper person to be the guardian. (*Kellinger* vs. *Roe*, 7 *Paige*, 362.)

The stepmother is young, has no relatives, and probably no strong ties binding her to a residence here, and it is quite possible that she may both change her condition by marrying again, or return to Charleston, her original residence, or fix her domicil at some other place away from New-York, thus severing the connection existing between the minor and all her relations of mature age. The fact that the stepmother has two young children of her own, requiring a large share of her attention and naturally engrossing the chief place in her affections, would demand on her part for the faithful treatment of this child, the possession of a high sense of duty, qualities of patience, and impartiality, moral characteristics of no inferior order. Mrs,

Cozine, on the other hand, has her son-in-law and two daughters living with her, Mr. and Mrs. Fleet having no children, and Jane being the one who from the birth of the child, filled, as far as possible, a place so difficult to occupy, that of a tender nurse and mother. Can there be a doubt that, in such a home, this orphan child would be treated with the utmost kindness, and be as well cared for as in the family of the stepmother, if not better? There never seems to have been a suspicion on the mind of any one, that the girl, while in the house of her grandmother, met with any thing but gentle usage; indeed, the complaint seems to have been, that she was in danger of being spoiled by excessive indulgence. She is older and more matured now, and if placed under the guardianship of Mr. Fleet, may have the advantage of manly direction and guidance, to temper the over-fondness of her grandmother; and notwithstanding the hostile feeling evinced by her deceased father towards Mr. Fleet, he stands proven before me, to be a man of piety and intelligence. Though in straitened circumstances, the testimony establishes affirmatively, that he is likely to be a capable and worthy guardian, and the pecuniary interests of the minor can be protected by requiring from him the proper security, for the faithful discharge of his trust.

These facts are all strong inducements to appoint him the guardian, and against them, stand, almost, if not entirely alone, the wishes of the deceased father. To his judgment, and his means of forming a judicious opinion, it would be right under ordinary circumstances, to defer greatly. But it does not appear that he was always aware of the treatment the child received from her stepmother during his absence, and had the facts proved before me been known to him, it is reasonable to suppose, he would have hesitated before attempting to leave his daughter under the control of her stepmother, unless the influence of his wife was more potent than his affection for his child. The prominent motive of Mrs. Horn, in now claiming the

guardianship, seems to be a desire of complying with the directions of her husband, and such a motive is highly praiseworthy. But for the good of the orphan, I would rather, motives of kindness and regard for the child should mingle with her sense of duty, and respect to the memory of her husband. I cannot shrink from the obligations of justice, and however much I may regret to say it, I am bound, freely to express the impression made on my mind by the testimony, that the conduct of this lady has not been characterized by any marks of strong affection towards the child. If, during the life of her husband, she could treat this orphan girl with such severity; if in a public house, she could not so restrain the hand of discipline as to avoid the censure of strangers, or so control her feelings as to keep within her lips the expression of hate towards her, how dare I, when the eyes of the father are closed, and the check of his influence is removed, trust the child to her control, when kinder arms are open to receive her. The evidence as to Mrs. Horn's temper, given by her own relative, and as evinced in the management of her own children, confirms rather than weakens this conclusion. The disposition of the child appears to have been gentle, and open to kindly influences; her constitution is delicate, and her sex not such as to require severe and rigid discipline. Under all these circumstances, I am irresistibly led to believe, that the comfort, happiness and true welfare of the minor, will be best consulted by intrusting her to the guardianship of her uncle, and the order must be made to that effect upon his giving the requisite security.