35b 85
12ap400

THE PEOPLE, *ex rel.* Clark B. Brooks, *vs.* LYDIA H. BROOKS.

A wife, while living in a state of voluntary separation from her husband, has
no rights in respect to the care and custody of her children, under the act
of March 20, 1860, concerning the rights and liabilities of husband and
wife, which can be enforced by habeas corpus, or in any other way.

Whatever rights she has, are secured to her by the provisions of the revised
statutes relating to parents and children. (2 *R. S.* 148, §§ 1, 2, 3.)

Whether a wife's claim to the care and custody of her child be under the re-
vised statutes, or under the act of 1860, evidence as to the causes of her
separation from her husband, and as to the relative merits and demerits of
the parties, with a view to the exercise of a sound discretion by the court,
should be received, on the return of a habeas corpus sued out by her.
MULLIN, J. dissented.

APPEAL from an order of Justice MULLIN, made at a
special term, upon the return of the respondent to a writ
of habeas corpus, issued upon the petition of the relator to
obtain the custody of Russell J. Brooks, the infant child of
the parties. The petition of the relator alleged that his wife,
the respondent, left him without any just cause or provoca-
tion, and remained away without his consent and against
his wishes, and retained the custody of the child. The
return to the writ alleged that the child was placed in the
custody of the respondent by the county judge of Lewis
county, in proceedings upon a habeas corpus issued and al-
lowed by him; that the relator and respondent were mar-
ried to each other in November, 1856, and that the child
in dispute was born in September, 1857; that on the 6th of
May, 1858, the respondent left the residence of the relator in
consequence of ill treatment by the relator; and that she
procured the child by means of the writ of habeas corpus
issued by the county judge. Upon the hearing, the relator
offered to prove, in answer to the return, that the respondent
left his bed and board and dwelling, and took away the child,
without the cause alleged by her, and without any just cause
or provocation; that he, the relator, was of good moral char-
acter and habits, and in all respects suitable and competent
to take care of the respondent and child, and was and has

been at all times able and willing, and had continually offered the respondent so to do, and had been continually refused by the respondent; that he never abused or ill treated her; and that she never complained of any abuse or ill treatment; and that there was no just claim or ground for the separation. The justice excluded the offered evidence, and held and decided that unless it could be shown that the respondent was not of good moral character and habits, and in that respect unfit and incompetent to have the guardianship of the child, the testimony offered was irrelevant; and that, under the act of 1860, she was entitled to the custody of the child. And by his order he gave the custody of the child to the mother. From that order the relator appealed.

*Jno. Clarke,* for the appellant.

*J. F. Starbuck,* for the respondent.

*By the Court,* ALLEN, J. Among the many radical changes in the domestic relations attempted by recent legislation, none is more pregnant with grave consequences for good or for evil than the very brief and summary statute which gives rise to this controversy.

The 9th section of the act of 1860, "concerning the rights and liabilities of husband and wife," (*Sess. Laws, p.* 157,) is in these words: "Every married woman is hereby constituted and declared to be the joint guardian of her children with her husband, with equal powers, rights and duties in regard to them with her husband." Conceding the necessity and propriety of this legislation, a more crude or imperfect law I think can hardly be found upon the statute book, or one having less reference to existing laws and rights, or prepared with less thought or provision for carrying it into effect, and adjusting all correlative and incidental rights and duties to the new relations of parties. I doubt if any effect can be given to the statute, and perhaps in that way it would be less

mischievous than in any other. But if in any way it can work the great change in the "family" which was evidently in the mind of its author, mischief, and that only and continually, will be the fruit of it, so far as it bears fruit. Ordinarily there is no just cause of complaint that the wife is not influential in the education, training and caring for the children. Mutual interest, confidence and affection supply the want of legal enactments, and make the "joint head" of the family a unit in mind and will in the government and guardianship of their children, give harmony and tone to family counsels and efficiency to their results. When for any reason, whether wrong headedness and unjust assumption and disregard of the wife on the part of the husband, or unfitness on the part of the wife, this is not so, it is better for the children, whose welfare is the motive and end of legal guardianship, that there should be a legally recognized head and guardian, subject to the power of the courts to remove for cause, than that they should be the sport of never-ending contest between the rival claimants for their custody and control; and instead of proving a strong cord binding the parents to each other, they should be the bone of contention, an apple of discord and constant *casus belli* between them. The good of the children must necessarily be made to yield to the natural desire to succeed in the controversy for power and supremacy in a dual-headed family. While by the Roman law and the civil code of France, as well as by the common law, the father is the recognized lawful guardian of his children and entitled to the custody of their persons, the courts, as the representatives of their sovereign — the *parens patriæ* — may in their sound discretion, and when the morals or safety of the interests of the children require it, withdraw the infants from the custody of their father, and give them to the mother, or place the care and custody of them elsewhere. This jurisdiction to remove infant children from the custody of their parents, and to superintend their education and maintenance, although one of extreme delicacy and

responsibility, is nevertheless well established, and indispensable to good order and the just protection of society. It has been repeatedly exercised in this state, and has been acted upon for one hundred and fifty years in England, and was recently confirmed by the house of lords in *Wellesley* v. *Wellesley*, (2 *Bligh, N. S.* 124; *S. C.,* 2 *Russ. Rep.* 20, 21.) The jurisdiction proceeds upon the theory that the right of guardianship is a trust for the benefit of the child, and the parent is not at liberty to abuse it. It is not important here to inquire in what cases and for what reasons the courts will interfere with the parental control of infants. It is sufficient to say that the welfare of the child alone is considered by the court in the exercise of this jurisdiction. It acts only for the benefit of the infant, without regard to the feelings of the parents. (*De Manneville* v. *De Manneville,* 10 *Vesey,* 52. *Ex parte Woolstonecraft,* 4 *John. Ch.* 80. 2 *Kent's Com.* 220. *And see the cases cited in the opinion at special term.*) It may be admitted that, notwithstanding this beneficent power rested in the courts and liberally and wisely exercised as it has been for the benefit of infants, cases of extreme hardship have resulted from the jealous care with which at common law the rights of a father are enforced. A man of the most immoral character, whose conduct towards the mother is such as to render it impossible for her, without sacrificing her dignity and self respect, to live with him, may yet be so cautious as not to bring his children into actual contact with pollution, or to ill treat them physically, and thus embitter the life of the mother by depriving her of the society of her offspring. (*Ball* v. *Ball,* 2 *Sim.* 35. *Forsyth's Custody of Infants,* 28 *et seq.*)

In the revision of the statutes of this state in 1830, a remedy was provided for these exceptional cases of hardship. It was enacted that when any husband and wife should be in a state of separation without being divorced, and should have any minor children of the marriage, the wife being an inhabitant of the state, might apply to the supreme court for a ha-

The People *v.* Brooks.

beas corpus, to have such minor child brought before it, and on the return of such writ, the court might, on due consideration, award the charge and custody of the child so brought before it, to the mother for such time, under such regulations and restrictions, and with such provisions and directions, as the case might require, and might at any time, after the making of such order, annul, vary or modify it. (2 *R. S.* 148, §§ 1, 2, 3.)   The child being before the court upon a habeas corpus directed to the mother and issued at the suit of the father, in the assertion of his common law rights, would give the court jurisdiction over the parties and the subject matter, and authorize an adjudication under this statute. This statute does not declare on what grounds the court shall proceed, but confides the whole matter to its discretion, and hence the occasion, cause and circumstances of the separation, and the relative merits and demerits of the parties may be taken into account. (*People* v. *Chegaray,* 18 *Wend.* 637.) A statute somewhat similar, in provisions and purposes, was passed in England, in 1839, (2 & 3 *Vict. ch.* 54,) and the jurisdiction conferred upon the officers named was to be exercised upon the petition of the mother.   That statute applied to cases where the infant was "in the sole custody or control of the father thereof, or of any person by his authority."   And Vice Chancellor Knight Bruce was of the opinion that, within the equity of the statute, the court had jurisdiction when the mother had the possession of the child, but the father had sued out a writ of habeas corpus returnable before Mr. Justice Patteson, to get possession of it. (*Forsyth's Custody of Infants,* 142, 143.)

For any wrong done the respondent by the petitioner in compelling her to leave his bed and board, and by ill usage depriving her of the comfort and society of her child, the revised statutes afford her an ample remedy, and all that the legislature have thus far seen fit to give her.   It has not been thought wise, as yet, absolutely to take from the husband, and transfer to the wife, the common law duties and correspond-

ing rights which attach to him as the legally responsible head of the family. He is still bound to receive and support his wife at his house, and is liable for her debts contracted for necessaries during coverture, and is bound to govern his house properly; he is liable for its misgovernment, and may be punished for keeping a disorderly house, although his wife has the principal agency. He has a right to establish himself where and in such lawful business as he pleases, and so long as he performs his marital obligations the wife is bound to follow him wherever he may desire to establish himself, within the United States. The father is bound to support his children, and in return the law gives him the right to their labor or the fruit of it. Any law which radically interferes with and overthrows these established rights and duties, in the proper observance and performance of which society has a deep interest, should be very plain and explicit, and nothing should be taken in favor of social anarchy and domestic discord, by implication. If a wife can by law, upon her own volition, without just cause, leave her husband's bed and board, disown all allegiance to him, repudiate her conjugal vows and duties, break up the family by taking away the children of the marriage, and deprive the husband of the power of fulfilling his obligations to her offspring and society, then indeed have very great and very sad changes been made by a very short statute, in the laws regulating the social and domestic relations. As the duty of support and protection to the infant, and responsibility to society for the government of the family, and the right to the care and custody of the child, and the ordering of the family, are correlative and dependent the one upon the other, if the law has taken away the rights, the duties from which the rights result, and to the performance of which the rights are essential, are abrogated; and the child is then left without lawful protectors, and society is without any security for the proper performance of important social duties. The common law rules affecting the relative rights and duties of husband and wife,

The People *v.* Brooks.

and parent and child, have respect to the interests of society and the welfare of the public, and are regarded as the necessary foundation of sound morals and good order, and are in force except as changed by express legislation. And before the wife, in the absence of any fault in the husband, can claim an exclusive right, as against him, to control the family, or to have the sole care and custody of the children, she must be able to point to a positive rule of law thus preferring her to the husband, and conferring upon her more rights; and the same law should impose upon her corresponding duties and responsibilities, and confer the necessary power to discharge them. The statute of 1860 does neither the one nor the other. It sets aside no common law right in the father, except so far as it is exclusive, and confers no rights upon the mother, except such as may be enjoyed jointly and upon an equality with the father. It gives no exclusive rights to the wife, and gives her no power to perform any of the duties or discharge any of the responsibilities which, at common law, rested upon the father. The statute makes her " the *joint* guardian of her children with her husband." So far as this guardianship includes the custody and care of the person, it must be exercised with her husband, and not away from or exclusive of him. It is only in connection with her husband that she takes any right of guardianship, under the statute. The common law right of the husband remains, except as modified by joining the wife with him. If for any reason the wife is in a situation in which she cannot avail herself of the right conferred in connection and jointly with her husband, the statute is unavailable for any purpose. It must be borne in mind that the rights of the wife, under the statute, are mere rights dependent upon the statute for their existence, and limited by the act itself; and to give the wife the custody of the children while being separated from her husband against his wishes, under color of the statute, would be to give her the several and exclusive control, and not a control of them jointly with him. The statute would be made

to work an entire loss of the common law rights of the father, at the option of the wife, if by any means she could possess herself of the children. So too the " powers, rights and duties" of the wife in regard to the children, are, by the statute, made " equal" with the husband, not paramount or superior, and can only be enjoyed and exercised under circumstances in which the husband's equal rights may be secured to him. There is no evidence of intent in the statute to confer any rights upon the wife as rights to be exercised in severalty, or separate from her husband ; or to give her any rights to or over the children, except when being with her husband and acting in concert with him. The law can only be carried into effect while the parents are living together. When they are separate from and independent of each other, the joint guardianship cannot be exercised, and the husband is remitted to his common law rights. The rights of the wife, when living separate from her husband, are to be governed by the revised statutes. But if I err in this view of the statutes, the most that can be claimed in behalf of the wife is, that she and her husband are, by the statute, made equal, and in that case it is not the mere accidental custody or possession of the child that is to determine the right to the continued custody and care. A child is not to be regarded as a chattel, or the parents as tenants in common, but the court, in case of contest between the parents, must look into the circumstances, and make such disposal of the child as the interests of the child and of society demand. If the husband is in all respects fit and proper to have the care of the child and to superintend its education, and other things are equal between the two, the recognized paramount right of the father must prevail over the otherwise equal claims of the mother. But if the mother is, without just cause or provocation, living in open violation of her conjugal duties, and setting at defiance the claims of her husband to her society and assistance, she does not possess equal claims to the children, and shows herself in a measure unfit to be entrusted with their education. At least the

The People *v.* Brooks.

courts ought not to encourage immoral and vicious conduct of this character by giving her the children, to the exclusion of the husband, who, it may be, is ready to discharge all his duties as a husband and parent as well as a member of society. The discretion of the court, so far as it has a discretion, should be exercised in favor of the party not in fault. And whether the claim of the mother is under the revised statutes or under the law of 1860, if she has any claim while living separate from her husband, under the latter act, the inquiry would be the same. Courts have always been very careful not in any way to encourage the dangerous and unlawful practice of husband and wife living in a state of unauthorized separation. And whenever the wife, without just cause, lives apart from her husband, she is deemed to have forfeited her claim to her children. *In re Taylor*, (11 *Sim.* 178,) Vice Chancellor Shadwell refused to make an order under 2 & 3 Vict. where the wife had left her husband without sufficient cause. The vice chancellor expressly declared that there was nothing whatever to sully the character of the petitioner. She had only followed injudicious advice to live separate from her husband. The circumstances and cause of the separation were inquired into by Vice Chancellor Knight Bruce upon a like application, by Mrs. Tomlinson, for the custody of her children, (*see Forsyth's Custody of Infants*, 142,) and by the vice chancellor and lord chancellor in *Warde* v. *Warde*, cited in the same book, pages 31 to 36, and again at page 144. The question was considered by the chancellor in *The People* v. *Mercein*, (8 *Paige*, 47;) and while he held that the rights of guardianship could not be tried upon a habeas corpus, he decided that when parents were living in a state of separation, either with or without a legal divorce authorizing a suspension of matrimonial cohabitation, a summary inquiry into the merits and demerits of each may be necessary to enable the court to make a proper disposition of the infant children brought up on a habeas corpus. In that case many days

were spent "in the investigation of the causes which led to the separation between the relator and his wife," and the chancellor put his decision upon the ground that Mrs. Barry, the mother, was for the present justified in her refusal to accompany her husband to Nova Scotia, and that she was not therefore living in a state of separation from him which could be properly considered illegal and immoral. The same question was considered by the supreme court in *The People ex rel. Nickerson* v. ———, (19 *Wend.* 16.) Ch. J. Nelson, referring to the statute before quoted, (2 *R. S.* 148,) says, "it may be well doubted, I think, whether this statute was intended to apply when the wife withdraws from the protection of the husband, and lives separate from him without any reasonable excuse; because then the separation would be unauthorized and in violation of the law of the land. It was partially designed to remove the difficulty that existed at common law, in denying or restraining the authority of the father in the case of an authorized separation, such as for ill usage, or by consent, when no ground existed for impeaching that authority upon common law principles. The legislature could not have intended that the court should ever award to the mother the care and education of her minor children when she had wrongfully, and without pretense of excuse, abandoned her family and the protection of her husband, if he was in a situation to take care of them, and no well founded objection existed in the case." The same principles were reasserted and affirmed in *The People* v. *Humphreys*, (24 *Barb.* 521.) It cannot be that by the act of 1860 the legislature intended that a wife, by her own immoral and illegal disregard of her marriage vows and her duty as a wife, could deprive her husband of the companionship and education of his children, under pretense of giving her equal rights and making her joint guardian with him. Her sins, in that case, would work a forfeiture of his rights in her favor. To reject the evidence offered, and shut out all inquiry into the causes of the separation, is to encourage rather than

The People *v.* Brooks.

discourage the voluntary separation of husband and wife, against which courts and legislatures have hitherto set their faces.

I am of the opinion that while living in a state of voluntary separation from her husband, the wife has no rights under the act of 1860 which could be enforced by habeas corpus, or in any other way; and that whatever rights she had, were secured to her by the provisions of the revised statutes before quoted. And 2d. That whether her claim to the care and custody of the child was under the one or the other statute, evidence as to the cause of the separation, and as to the relative merits and demerits of the parties, with a view to the exercise of a sound discretion by the court, should have been received. Even if a joint power or trust is to be exercised by two, and they differ, the trust must remain unexecuted, or the court must decide between them. It cannot be that an important trust, in the due execution of which the public, as well as the object of the trust, has a deep interest, is to be exercised by the one or the other of the trustees, against the wishes of the co-trustee, as chance or fraud or force may give to the one or the other the present manual custody of the subject of the trust. I am of the opinion that for the error suggested the order must be reversed, and the proceedings be remitted to be further proceeded on at special term.

BACON and MORGAN, Justices, concurred.

MULLIN, J. dissented.

Order reversed.

[ONONDAGA GENERAL TERM, April 8, 1861. *Bacon, Allen, Mullin* and *Morgan,* Justices.]